### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.: CR-07-00022-001(RJL) |
| | ) | |
| JOHN E. DIFAZIO | ) | |
| _____ | ) | |

### JOHN E. DIFAZIO'S MEMORANDUM IN AID OF SENTENCING

Defendant John DiFazio, through counsel, respectfully submits this memorandum in aid of sentencing. The sentencing hearing is scheduled for September 20, 2007.

## I.  INTRODUCTION

On March 21, 2007, Mr. DiFazio pleaded guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5). The Probation Office recommends a total United States Sentencing Guidelines calculation level of 26, which corresponds to a Zone D sentencing range of 63 to 78 months imprisonment. As discussed in detail below, Mr. DiFazio, while fully accepting that his conduct merits punishment, submits that a Guidelines sentence would not be reasonable in this case and he respectfully asks this Court instead to issue a non-Guidelines sentence that is "sufficient, but not greater than necessary" to comply with the sentencing goals set forth in 18 U.S.C. § 3553(a).

In requesting a variance from the Guidelines, Mr. DiFazio does not seek to avoid punishment for his conduct and he does not contest that the images he possessed in his office are repugnant. And although he did not fully appreciate it at the time, Mr. DiFazio now understands that even possessing child pornography results in harm to real children. However, Mr. DiFazio respectfully submits that a jail sentence in excess of five years is surely "greater than necessary" to comply with the sentencing goals set forth in 18 USC

1

§ 3553 (a).  Among the factors that support a more lenient sentence than that suggested

by the Guidelines are: (1)  Mr. DiFazio has no prior criminal record; (2) he has

cooperated fully with federal authorities from the start of this investigation and has

shown genuine remorse for his conduct; (3)  he has sought the highest quality

professional treatment for his behavior to help him understand why he was attracted to

child pornography and help ensure that he will never look at it again; (4) he is the only

child of a recently widowed, elderly mother who relies upon him for assistance; (5) he is

a loving husband and the devoted father of two teenage children whose lives will be

devastated if Mr. DiFazio is sentenced to a long period of incarceration; (6)  he has

already suffered significant professional and personal repercussions as a result of his

actions; and (7) in the two and a half years since his office was searched there has been

no indication that he has viewed, or attempted to view, child pornography.  In light of

these factors, Mr. DiFazio respectfully requests that the Court sentence him to a term of

probation with conditions, including a lengthy period of home confinement (with

electronic monitoring and restricted access to the Internet), and significant community

service requirements.

## II.     BACKGROUND AND OFFENSE

### A.     Mr. DiFazio's family and professional background

Mr. DiFazio is a 57-year-old married father of two teenage children.[1]  He lives in

Fairfax Station, Virginia, with his wife of over 28 years, Debra.  Debra is a high school

teacher in the Fairfax County public school system.  His son Stefan, who is 18 years old,

recently graduated from Thomas Jefferson High School for Science and Technology, a

---

[1] The children were adopted as infants from Poland.

magnet school for gifted & talented students, and is now a freshman at the University of Virginia. Along with excelling in the classroom, Stefan also participated in soccer, baseball, golf, wrestling, and acting. His daughter Alina, who is 15 years old, is a sophomore in high school. Alina, who was born prematurely and has been developmentally delayed, has now caught up to her peer group and is a good student who plays soccer and field hockey.

Mr. DiFazio has an excellent relationship with his children. He has been vitally involved in their daily lives, from helping with homework, to taking them to the doctor, to supporting their various extracurricular activities. It can't be emphasized strongly enough that Mr. DiFazio has never engaged in any untoward behavior toward his children or to any other children. Indeed, his doctors have concluded that he poses virtually no risk to children, and his wife and marriage counselor strongly agree with them.

Mr. DiFazio is also the only child of a recently widowed 89-year-old mother who is in poor health. Letter from Josephine DiFazio, Exhibit 1. Mr. DiFazio's father recently passed away from prostate cancer. The DiFazios are now making arrangements to have Josephine DiFazio move in with them in Virginia in order to care for her. As Mrs. DiFazio succinctly puts it in her letter to the Court: "John is invaluable to me and will remain so for the rest of my life. I cannot survive without him." Exhibit 1 at 2.

Prior to his guilty plea, Mr. DiFazio enjoyed a successful career as an attorney. Indeed, throughout his life he has consistently done well in school and professional settings. He attended Catholic schools, where he excelled academically, prior to entering and graduating from Lehigh University in Bethlehem, Pennsylvania, with a degree in chemical engineering. He received a Masters in Public Administration from the

University of Southern California in 1981 and a JD from Catholic University in 1982. He then worked in various legal and investment advisory positions following law school and in 1987 became assistant general counsel for the Consumer Specialty Products Association ("CSPA"), where he was employed when his work computer was seized by federal authorities in March 2005. Upon pleading guilty to the instant offense, Mr. DiFazio retired from the CSPA.

Until his recent retirement, Mr. DiFazio was his family's primary source of income. In order to help off-set the lost income and help cover legal and medical expenses, Mrs. DiFazio has switched from working as a part time substitute teacher to a full time teacher in the Fairfax County public school system. Mr. DiFazio, in turn, has taken over many of the household and parenting functions previously performed by his wife. These duties are expected to increase substantially with the additional responsibility of caring for his ailing mother. Needless to say, a long prison sentence for Mr. DiFazio will place enormous emotional and financial stress on the family.

    B.    Nature of Mr. DiFazio's Conduct and Medical Treatment

It is important to note that Mr. DiFazio's interest in child pornography is a relatively recent phenomenon in his life. His interest in child pornography is best understood as a culmination of a need to view material with increasingly higher shock value, not as a reflection of a lifetime sexual attraction to children. Indeed, for most of his adult life, Mr. DiFazio viewed only adult pornography. In approximately 2001, as he became desensitized to images of adult sexual activity, he moved on to material that was increasingly "taboo," and ultimately, to material that was illegal. At first, his interest shifted from adult pornographic images to viewing non-pornographic images of young girls, particularly websites devoted to child stars. He then gradually sought out

increasingly sexualized images of children on the Internet.  At all times, he viewed these images either in the privacy of his office or while on out of town business trips.  He never brought these images into his home nor did he ever view pornographic images on his home computer.  Significantly, he never redistributed any pornographic images to any third party.

Shortly after his office was searched by federal agents, Mr. DiFazio took immediate steps to determine why he had become attracted to sexual images of children and to seek treatment to ensure that he would never do so again.  Specifically, Mr. DiFazio immediately sought treatment at the National Institute for the Study, Prevention, and Treatment of Sexual Trauma at Johns Hopkins University, one of the premier treatment centers in the country for sexual disorders,[2] where he has attended weekly or bi-monthly, specialized, group psychotherapy sessions.  This therapy has helped him to better understand his behavior and to develop effective relapse-prevention techniques. He has also enrolled with his wife in marital counseling in order to get help for underlying emotional difficulties that may have contributed to his disorder.

Attached to this Memorandum are several reports by the psychotherapists at Johns Hopkins who have treated Mr. DiFazio.  Exhibit 2.  These expert therapists and doctors, who have been treating Mr. DiFazio for two and a half years, state that Mr. DiFazio is not a danger to children and the risk of his re-offending are low.  *Id.*  They conclude that Mr.

---

[2] The clinic Mr. DiFazio is attending has been recognized as a "National Resource Site" by the United States Department of Justice "in part . . . because of its success in treating individuals with sexual disorders safely in the community."  Exhibit 2.

DiFazio did not "view[] child pornography as a prelude to being with an actual child;" rather, Mr. DiFazio suffers from voyeurism and "pedophilia in fantasy only." *Id*[3]

The therapists at Johns Hopkins further note that continued participation in group therapy is the most effective way to treat his disorder and write of his progress and of his good attitude in the therapy program. According to Ms. Davis and Dr. Berlin, Mr. DiFazio has been "very compliant and cooperative" and "has been willing to follow all treatment recommendations." *Id*. Moreover, he "has become a vital member of his therapy group, and he has gained insight and knowledge regarding his sexual disorder." *Id*.

The therapists add that in their professional judgment, Mr. DiFazio would not be a danger to the community. *Id*. First, overall recidivism rates for those who have been treated at the Hopkins clinic are less than eight percent. *Id*. Second, the doctors believe that the risk is even lower for Mr. DiFazio: "We have successfully treated patients who have had significantly greater psychiatric vulnerabilities, and in our professional opinion, the patient is certainly at the low end of the risk continuum." *Id*. Mr. Feldman, who has been Mr. DiFazio's therapist at Hopkins since February of last year, states that all of the elements necessary for preventing dangerous behavior are present in this case. In sum, Mr. DiFazio's psychotherapists, who are nationally recognized experts in this field,

---

3 The Court has also received an independent report from Stephanie Hardenburg, a therapist in Woodbridge, Virginia. Several of the statements attributed to Mr. DiFazio in her report are either wrong or taken out of context, or not objective (during the interview, Ms. Hardenburg made critical comments about the Hopkins clinic and suggested to Mr. DiFazio that he join her practice instead). We submit that the Court should weigh more heavily the findings of the Johns Hopkins Institute, and in particular Richard Feldman, who has spent over 80 hours with Mr. DiFazio, than those of Ms. Hardenburg, who spent less than two hours with him and attempted to recruit him to her practice. With that said, Ms. Hardenburg still found Mr. DiFazio "to be within a low-average range for risk of reoffense."

consider him a low risk to either commit a sexual offense with a child, which he has never done, or relapse into his previously voyeuristic behavior.

The therapists at Johns Hopkins also state that a lengthy period of incarceration in this case is both unnecessary to protect the public and counterproductive to the goals of his therapy, which are to make sure he never looks at child pornography again. Mr. Feldman, who served as a Federal Probation Officer for twenty-six years, including as a Senior US Probation Officer with a case load which included sex offenders, states that the Guidelines in this case "seem excessive" and instead recommends a sentence that includes "an extended period of home confinement and electronic monitoring." *Id.*

These comments are echoed by the DiFazios' marriage counselor, Theresa Shaltanis. She attests that she has "found that John has always been an involved & willing participant in the therapy process, never missing sessions." He has "even com[e] on his own if his wife was not available or if individual sessions were recommended by me." Statement by Theresa M. Shaltanis, M.A., Licensed Professional Counselor, Exhibit 3 at 1. Ms. Shaltanis notes that Mr. DiFazio has shown great remorse, has made no excuses for his poor choices, and "has made substantial changes that demonstrate his ability to be truly invested in his wife and family." *Id.* at 2. Moreover, she concluded, "I do not believe that John is a threat to society regarding child pornography or sexually inappropriate behavior. John has worked hard in and outside our therapy sessions in the development of healthy patterns." *Id.* She, like Mr. DiFazio's psychotherapists at Johns Hopkins, recommends the "least restrictive sentence" because she is convinced he has learned from his mistakes and poses no future danger to others. *Id.*

7

None of this in any way diminishes the real harm caused by Mr. DiFazio's actions, which he fully recognizes. As stated previously, he now understands that what he rationalized to be victimless conduct done in the privacy of his office in fact helps perpetuate the market for child pornography, thereby causing real abuse to real children. Mr. DiFazio is mortified and ashamed of his behavior. As he told the government agents when they conducted a search warrant of his office and confronted him with the images:

> I understand fully now from talking with the Inspectors that in order for child pornography to be produced a child must be sexually abused. As a father of 2 kids I am ashamed and embarrassed that I would even think about doing this. Just a few hours ago it was a new sexual thrill but now it is revolting and disturbing. I will never engage in such activity again as God is my witness.

> DiFazio Statement , Exhibit 4.

We submit that sentencing Mr. DiFazio to over five years in jail, as called for by the Guidelines, will not in any way further convince him that what he did was wrong and should never do it again, nor is it necessary to advance the interests of justice.

## III.  SENTENCING FACTORS

Following *United States v. Booker*, 534 U.S. 220 (2005), courts are no longer bound by the United States Sentencing Guidelines. *United States v. Pickett,* 475 F.3d 1347, 1353 (D.C. Cir. 2007); *United States v. Ayers*, 428 F.3d 312 (D.C. Cir. 2005); *United States v. Dorcely,* 454 F.3d 366, 374 (D.C. Cir. 2006) ("we now review any sentence, *whether within the Guidelines range or not,* 'to ensure that it is reasonable in light of the sentencing factors that Congress specified in 18 U.S.C. § 3553(a)'") (quoting *United States v. Price,* 409 F.3d 436, 442 (D.C. Cir. 2005)) (emphasis added). Courts must now engage in "a two-step analysis" when sentencing defendants. *United States v. Doe,* 412 F. Supp.2d 87, 90 (D. D.C. 2006). First, a district court must calculate the

range prescribed by the Guidelines.  Second, the court must then consider the reasonableness of that range in light of the factors set forth in 18 U.S.C. § 3553(a).  *Id.* (citing *United States v. Clark,* 434 F.3d 684, 685 (4th Cir. 2006)).  Significantly, courts now have the discretion to grant greater leniency than the Guidelines if the § 3553(a) factors warrant it.  *United States v. Brown,* 449 F.3d 154, 160 (D.C. Cir. 2006) (*Booker* gives judges "greater latitude in assessing potentially mitigating factors than they had under the Sentencing Guidelines").

As discussed below, a Guidelines sentence for Mr. DiFazio would not properly weigh the factors set forth in 18 U.S.C. § 3553(a).  Factors of lesser or no relevance under the Guidelines, such as "age, educational and vocational skills, mental and emotional conditions, physical condition, employment record, and family ties and responsibilities" are *directly relevant* under the factors enumerated in § 3553(a).  *Simon v. United States,* 361 F. Supp.2d 35, 40 (E.D. N.Y. 2005); *see also Price*, 409 F.3d at 441 (enumerating similar factors in determining whether a sentence is "reasonable").  This conclusion is important because these factors viewed in light of the facts here indicate that a more lenient sentence for Mr. DiFazio would better serve the purposes of § 3553 than a Guidelines-based one.

A.    Sentencing Guidelines Calculation

The PSR recommends a total Guidelines calculation of 26.  The only disagreement Mr. DiFazio has with the calculation relates to the number of images he possessed.  Although the plea agreement with the government provides that the number of images is between 10 and 150, which corresponds to a 2 point enhancement, the Probation Officer determined that he possessed 295 images of child pornography, which corresponds to a 3 point enhancement.  While Mr. DiFazio does not dispute the total

number of images ultimately discovered is what is listed in the PSR, he submits that he should be held accountable for the images discovered at the time the Government made its plea offer and that he should be given the benefit of the agreement he reached with the government.  Accordingly, we submit that the appropriate Guidelines calculation should be 25.  A guideline level of 25 corresponds to a Zone D sentence range of  57 to 71 months term of imprisonment.  We believe that this is the proper sentence range recommended by the Sentencing Guidelines.  If the Court sentences Mr. DiFazio under the Guidelines, we ask that he be sentenced at the lowest end of that range – *i.e.*, 57 months.  But even this sentence would not serve the factors set forth in § 3553, and for the reasons set forth in subsection B herein, we respectfully request that the Court issue a non-Guidelines sentence.

      B.    <u>Section 3553 Factors</u>

      Pursuant to 18 U.S.C. § 3553(a), courts must consider the nature of the offense and the characteristics of the defendant; the need for the sentence to promote policies underlying the criminal statutes; available sentences; Guidelines range; any policy statements; avoidance of sentencing disparities; and the need to provide restitution.  These § 3553 factors weigh in favor of a non-Guidelines sentence for Mr. DiFazio.

      1.    <u>Mr. DiFazio's personal and family characteristics weigh in favor of a non-Guidelines sentence.</u>

      Mr. DiFazio, who is 57 years old, has never been arrested for a crime, much less convicted of one, in his entire life.  He is also a loving and dedicated husband and father.  Significantly, Mr. DiFazio has until recently been the primary breadwinner for his family, which includes his two teenage children, one of whom is attending college this year, and will soon include an elderly parent.  As Mrs. DiFazio has returned to the workforce full

time in order to compensate for Mr. DiFazio's lost income, he has taken over the duties around the house and with the children that she used to provide.

Sentencing Mr. DiFazio to a lengthy term of imprisonment would be devastating to his family. It would deprive his children of the father whom they adore at a time when they are still developing and learning, and it would deprive his elderly mother of her only child at a time when she most needs his assistance. In short, several innocent people within Mr. DiFazio's family who depend on him for financial and emotional support would suffer as a result of a Guidelines sentence.

Needed care for aging parents and hardship on a defendant's wife and children have been considered factors by federal courts for a sentence below the Guidelines, even pre-*Booker*. *See, e.g., United States v. Jones,* 158 F.3d 492, 499 (10th Cir. 1998) (affirming lesser non-Guidelines sentence partly because of the "economic hardship" the defendant's "incarceration would inflict on his three children and estranged wife due to his decreased ability to pay child support"); *U.S. v. Ranum*, 353 F.Supp.2d 984, 991-92 (E.D. Wis. 2005) (imposing non-Guidelines sentence in part because defendant "provides care and support for his elderly parents"). Mr. DiFazio's family responsibilities therefore support a non-Guidelines sentence.

    2.    <u>A non-Guidelines sentence will reflect the need for the sentence to provide deterrence, public protection, and effective treatment, as well as impose a "just sentence"</u>

Section 3553(a)(2) sets forth four goals of sentencing:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner.

These factors weigh in favor of a non-Guidelines sentence for Mr. DiFazio. First, the stigma, the harm to his family, his damaged career, and the severe blow to his finances that he has already suffered and will continue to suffer already present a powerful deterrent example to others tempted to commit the same offense. Second, his actions, along with the clinical assessments of his psychiatrists and independent statistics published by the U.S. Sentencing Commission indicate that he is not likely to be a recidivist. Third, his medical treatment for the disorder that had led him to commit the offense could proceed uninterrupted. Fourth, a sentence of lengthy incarceration would not be just and reasonable under the circumstances, given that he has accepted responsibility for his offense, has taken affirmative steps to get help, and has cooperated fully with the authorities.

a.  Lengthy incarceration is not needed
as an extra deterrent in this case.

Any form of punishment that is associated with a felony conviction for a first-time offender will reflect the seriousness of the offense and promote respect for the law. It would, moreover, provide adequate deterrence to other similarly-situated professionals for whom any conviction and confinement would be life altering. *See, e.g., United States v. Myers,* 353 F. Supp.2d 1026, 1031 (S.D. Iowa 2005) (sentencing defendant to time served rather than Guidelines range of 20 to 30 months, stating that being branded a felon and being known as such by family, friends, and society is "no small punishment"). Mr. DiFazio will experience extreme shame in his community; he is likely to lose his license to practice law; his family's financial situation has deteriorated significantly; and his family life has been upended. In his wife's words, "Our lives have changed drastically as

a result of his past actions." Letter from Debra H. Bell, Exhibit 5. Even before any

Court-imposed sentence is imposed, his example serves as a major deterrent to others.

           b.        <u>Mr. DiFazio is not a likely recidivist.</u>

        The evidence before this Court strongly suggests that Mr. DiFazio is not a likely

recidivist from whom the public must be protected through a lengthy prison sentence. To

the contrary, Mr. DiFazio's actions illustrate that he is contrite and has taken affirmative

therapeutic steps to remedy his disorder so as not to pose a future hazard to the

community. Now that he is in therapy, as his wife puts it, he "is no longer alone in facing

his troubles." *Id.* The professional treatment he is receiving to remedy his disorder are

specifically designed to prevent Mr. DiFazio from regressing into his previous behavior.

This supervision by professionals and his family bolsters his commitment to recovery and

makes him much less likely to be a repeat offender. As stated previously, his

psychotherapists, his marriage counselor, and his wife, who have all observed him

closely for a lengthy period of time, do not consider Mr. DiFazio to be a danger to others.

        In addition, as other courts have found, the likelihood of recidivism for defendants

over 50 years old is very low. *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL

300073, at *4 (N.D. Ind. Feb. 3, 2005) (citing U.S. Sentencing Commission, *Measuring

Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at

12, http://www.ussc.gov/publicat/Recidivism_General.pdf (May 2004)).[4] "Recidivism

drastically declines with the defendant's age," one New York district court has recently

stated, a factor directly relevant to the 18 U.S.C. § 3553(a)(2)(c) consideration of "the

---

4 The D.C. Circuit Court of Appeals has explicitly endorsed the use of "any pertinent policy statements issued by the Sentencing Commission" as a valid factor to consider when sentencing in accordance with 18 U.S.C. § 3553(a). *Price*, 409 F.3d at 442. Therefore, to the extent that the U.S. Sentencing Commission's report on recidivism is a policy statement, it is relevant for the purposes of this sentencing analysis.

need to protect the public from the future crimes of the defendant." *Simon v. United States,* 361 F. Supp.2d 35, 40 (E.D. N.Y. 2005).

A U.S. Sentencing Commission report noted in 2004 that offenders over the age of 50 have a recidivism rate of only 9.5 percent, which constituted the lowest rate of all age brackets measured and was dramatically lower than the rate of 35.5 percent for offenders under 21. U.S.S.C., *Measuring Recidivism* at 12, 38 (there was no indication in the report that pornography or sexually related offenses were excluded from these statistics).[5] Moreover, by other measurements assessed in the 2004 U.S. Sentencing Commission report, Mr. DiFazio's statistical probability of recidivism is very low:

- those who were employed in the year prior to their offense had lower recidivism rates than those who had been unemployed by respective rates of 19.6 percent and 32.4 percent;

- those who had college degrees had only 8.8 percent recidivism rates, and were less statistically likely to be repeat offenders than those with less formal education;

- and those who were married had only a 13.8 percent recidivism rate, which was lower than those who were divorced (19.5 percent) or never married (32.3 percent).

U.S.S.C., *Measuring Recidivism* at 12.

---

5 Recidivism statistics that had been issued by the Sentencing Commission included a "stratified, random sample of 6,062 U.S. citizens," and there was no indication that there was a carved out statistical exception for possessors of child pornography or related offenses. U.S.S.C., *Measuring Recidivism* at 3. There was no statement in the report on whether and to what extent, if any, the lower recidivism trends for older offenders for crime in general differed from those guilty of child pornography-related offenses. The offenses were divided for purposes of statistical study into fraud, drug possession, drug trafficking, larceny, DUI, "serious violent offense" (including homicide, kidnapping, robbery, sexual assault, aggravated assault, and weapons offenses), and "other" offenses. *Id.* at 32.

Mr. DiFazio is married, has a family, has a college education, was employed at the time of the offense, and is over 50 years of age. By each of the above measures, he has the lowest statistical probability of being a repeat offender. These statistical indicators, combined with the clinical assessments of Mr. DiFazio's psychotherapists, supporting statements by his wife and marriage counselor, his contrition, and his personal and family history, present yet more evidence that Mr. DiFazio does not present a future danger to society. Therefore, there is not a need to "protect society from the future crimes of" Mr. DiFazio because he is highly unlikely to commit them again.

        c.       <u>Mr. DiFazio could best continue medical treatment if he is not incarcerated.</u>

Section 3553 states that courts "shall consider . . . the need for the sentence imposed . . . to provide the defendant with needed . . . medical care in the most efficient manner." 18 U.S.C. § 3553(a)(2)(D); *see also Price,* 409 F.3d at 446 (citing *Booker,* 125 S.Ct. at 765) (listing needed medical care as one of the factors to consider when sentencing). Mr. DiFazio's crime was rooted in a disorder for which he needed and sought professional medical help. He has been receiving that assistance since his office was searched over two years ago and, by all accounts, his treatment has proceeded successfully thus far. It would not serve the interests of the criminal justice system for the Court to interrupt that treatment by incarcerating him for a lengthy period of time. *See United States v. Simpson,* 430 F.3d 1177, 1186 (D.C. Cir. 2005) (affirming an opinion that cited § 3553(a) as a basis for taking into account "the interests of the criminal justice system" in sentencing). Moreover, courts have in the past declined to impose a lengthy prison sentence on the ground that such a sentence would impede progress the defendant made in counseling or treatment. *See United States v. Mapp*, 2007

WL 485513, No. 05-80494, at *4 (E.D. Mich. 2007) (citing *United States v. Pallowick*, 364 F. Supp.2d 923 (E.D. Wis. 2005) and *United States v. Jones*, 158 F.3d 492 (10th Cir. 1998)).

Mr. DiFazio has voluntarily undertaken an aggressive course of professionally supervised therapy for his attraction to child pornography and has benefited greatly from the program. This psychotherapy constitutes a form of medical treatment that has been invaluable in treating Mr. DiFazio's sexual disorder and preventing him from becoming a repeat offender. Dr. Berlin, the head of the Hopkins Institute and one of the leading authorities on sexual disorders in the country, states that Mr. DiFazio:

> is amenable to community-based treatment in a fashion that will not pose a risk to others. Were he allowed to remain in the community, he could continue to work full-time and to provide for his family, while receiving specialized care here. If there is any alternative form of holding Mr. DiFazio accountable and monitoring him, while allowing him to remain in the community, perhaps for example via home detention with work-release, this clinic would be willing to continue providing him with treatment, and to provide any necessary updates and progress reports as requested. As is our policy, were he to be required to attend treatment here as a condition of probation, any noncompliance would be reported to the appropriate probationary authority.

Exhibit 2. Recidivism rates from the Johns Hopkins program Mr. DiFazio attends are, as noted above, exceedingly low. Meanwhile, the failure to communicate that contributed to Mr. DiFazio's earlier choices in not seeking help for his disorder are being remedied with the help of a professional marriage counselor. If he were incarcerated, it would be impossible for Mr. DiFazio to continue to receive the same level of psychiatric treatment that would drastically diminish the likelihood that he would ever commit this offense again.

16

        d.      <u>Lengthy incarceration of Mr.<br>DiFazio would not be a just<br>punishment.</u>

A sentence of lengthy imprisonment would not support the policy that criminal laws should provide a "just punishment" because such a term of confinement would be disproportionate to the circumstances of this case: this is a first time offense, the defendant has led an otherwise exemplary family life, the defendant has voluntarily cooperated with government officials from the beginning, and the defendant has voluntarily sought treatment to ensure that this never happens again. Moreover, this factor requires the Court to balance the community's need for public protection and crime deterrence with a sentence providing the best treatment. Putting Mr. DiFazio in prison for over five years will not serve the public. The doctors at Johns Hopkins state that Mr. DiFazio is not a danger to children and he is at a low risk for again seeking out child pornography. Indeed, he has not done so for the past two and one half years. These doctors agree that a prison sentence "of approximately 5 years or more is extreme" in this case and that Mr. DiFazio could continue his therapy while confined to home detention and electronic monitoring.

        3.      <u>Issuing a non-Guidelines sentence will not result in<br>a significant sentencing disparity.</u>

Paragraph 6 of § 3553(a) admonishes courts to avoid "unwarranted sentence disparities" for those "found guilty of similar conduct." Statistics issued by the United States Sentencing Commission indicate that sentencing Mr. DiFazio to a non-Guidelines sentence will not result in a significant sentencing disparity. According to statistics compiled by the Commission regarding post-*Booker* sentences in Fiscal Year 2006, only 487 out of 743 sentences under U.S.S.G. § 2G2.2, which is the provision applying to

possession and solicitation of child pornography, were imposed within the Guidelines range.  U.S. Sentencing Commission, Sourcebook of Federal Sentencing Statistics, 2006 Annual Report Sourcebook, Table 28.

**IV.**    **CONCLUSION**

For the reasons stated above, defendant John DiFazio respectfully requests that the Court issue a non-guidelines sentence and instead sentence him to a term of probation with conditions, which could include a lengthy period of home confinement (with electronic monitoring and restricted access to the Internet), and significant community service requirements.

Date:   September 13, 2007                    Respectfully submitted,


                                              _____/s/_____
                                              Whitney C. Ellerman, Esq. (Bar No. 28874)
                                              HUNTON & WILLIAMS LLP
                                              1900 K Street, N.W.
                                              Washington, DC 20006
                                              (202) 955-1500
                                              ATTORNEY FOR JOHN E. DIFAZIO

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2007, a true and correct copy of the

foregoing has been served electronically upon the following:

**Angela Hart-Edwards**
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.
Washington, DC 20530

**Michael J. Penders**
United States Probation Officer
333 Constitution Ave., N.W.
Suite 2800
Washington, D.C.  20001-2866

_____/s/_____
Whitney Ellerman

To:    The Honorable Richard J. Leon
       United States District Court for the District of Columbia
       333 Constitution Avenue NW
       Washington, DC  20001

From:  Josephine M. DiFazio, mother of John E. DiFazio Jr.    *Josephine M. Di Fazio*
       18 Sentinel Hill
       Derby, CT  06418

I am writing to you in support of my son and only child, John.  I ask that you take all the
following into account as you determine a fair sentence and impose any subsequent conditions:
his prompt and continuing acceptance of personal responsibility and expressions of heartfelt
remorse; his substantial efforts to rehabilitate himself and his marriage; his overall goodness
throughout his life; his long-standing devotion to his wife and children; and my immediate and
compelling need for his dedicated assistance.  I will address only the last three items here.

My son has been a solid citizen throughout his life.  He was raised as a strict Catholic in a
Polish-American community in Derby.  (I am 100-percent Polish; my husband was 100-percent
Italian.)  John was a Boy Scout and altar boy in his youth; living next door to the church he was
often called upon to substitute for absent altar boys and did so without complaint.  He collected
for many charities and worked for several environmental organizations as a young man.  John
and his wife persisted for many years and overcame many barriers to adopt their two children
from Poland.  (I know because I was with them for both adoptions.)  In addition, they spread
their joy by organizing couples in the DC area who had or hoped to adopt from Poland into a
group called "HAPPY" – for "happy (or "hopeful") adoptive parents of Polish youngsters."
Through that they assisted others in adopting from Poland.  I could cite many more examples
but, in short, John has helped quite a few people and has never hurt anyone.

John waited till he was almost 29 to get married because he wanted to make sure he found the
right mate.  He started law school shortly afterward.  For that reason he and his wife Debra
decided to wait to have children.  They were confident that they would be ready, willing and able
to adopt when the time came, figuring that there would always be children in need.  In 1986,
seven years into their marriage, John and Debra decided that they were ready to pursue adoption.
I had found out about two couples who had adopted from Poland, where my parents were born.  I
also approached a Polish priest who was assigned to our parish for one year and he agreed to
deliver the necessary documents and assist in a search for a birth mother upon his return to
Poland in 1987.  In the meantime, John and Debra undertook a home study, criminal record
check, and courses on raising an adopted child.  After some heartbreaking false starts, they heard
in 1989 that their soon-to-be son Stefan was born.  Two harrowing months later, after enduring
surprising elections which created a power struggle between the Communist Party and
Solidarity, we brought Stefan home.

About three years later, John and Debra heard from the priest that a very sick infant girl, born
three months premature and weighing less than three pounds at birth, was being put up for
adoption in the same town where Stefan was born.  By coincidence, it is the same town where
my father was born.  Despite the risks (including blindness and delayed development), John and

Debra did not hesitate to accept the opportunity. When we arrived in Poland, their soon-to-be daughter Alina was very frail and subsisting on eight prescription medications. At least this adoption went smoother and we were all home within a month.

Stefan and Alina have presented different challenges to John and Debra, but they have done a stellar job raising both children. Stefan has proven to be very bright and motivated, traits fostered by John and Debra. They have expended extraordinary effort in his development, succeeding in getting him into the gifted-and-talented program in the Fairfax County school system and then into Thomas Jefferson High School for Science and Technology, one of the best in the entire nation. At TJ, Stefan won a "Cappie" drama award as well as three varsity letters in wrestling. John picked Stefan up from drama rehearsal and wrestling practice almost every day during his first three years at TJ. He will enter the University of Virginia shortly. On the other hand, Alina has required effort of a different nature and extent. Due to her significantly premature birth, she received considerable immediate attention to her health. She was soon down to one medicine but was discovered to have asthma, which caused her to be hospitalized on occasion while still an infant. In addition, she did not start speaking until she was 27 months old. John and Debra have worked diligently with her to the point where only an inability to focus for lengthy periods remains an obstacle. In addition, with John and Debra's encouragement to overcome her issues at birth, Alina has become very athletic. She has played travel soccer for the past seven years and her dad has driven her to almost every one of her more than 200 games and many of her countless practices. This past year in high school she played freshman field hockey and freshman basketball and participated on the track team, where she was credited as being a "great athlete" by the varsity track coach.

Finally and most importantly, I desperately need John, our only child, at this juncture in my life. After six months of agony, last month my husband died of a rare and aggressive form of prostate cancer while in the hospice section of the Veterans Administration hospital in West Haven, CT. John spent a week helping us last October when my husband was first hospitalized (but not properly diagnosed) and commuted on a regular basis from Virginia since the beginning of the year (when the correct diagnosis was made) to assist me and my husband. John placed my incapacitated husband in the car, drove us to and from the hospital, and carted my husband throughout the hospital for every chemotherapy session and all related treatments. John fed his father, watched sports with him, and read the paper to him, among other tasks.

I will be 90 years old in October. In addition, I am a two-time cancer survivor who underwent a colostomy three years ago. Further, I have chronic high blood pressure which severely restricts my driving and recently required my hospitalization for several days. John visits me regularly and usually accompanies me on my trips to see his family in Virginia. He is trying to get me to move down there or at least spend substantial time there so he can take proper care of me. John continues to manage my finances and investments. Further, he is dealing with the VA to get the agency to compensate me for $15,000 in expenses incurred at a private hospital (where the correct diagnosis of my husband was made). In short, John is invaluable to me and will remain so for the rest of my life. I cannot survive without him.

**JOHN E. DiFAZIO, JR.**
**April 12, 2005**

**National
Institute
for the Study,
Prevention and
Treatment of
Sexual Trauma**

104 E. Biddle Street
Baltimore, MD 21202
Phone: (410) 539-1661
Fax: (410) 539-1664
e-mail address:
fredsberlinmd@comcast.net

**Director:**
Fred S. Berlin, BS, MA, MD, PhD, PA

**Therapists:**
Lyndyl Blais, LCSW-C
Phyllis Burke, MA, LCPC
Richard Feldman, LCSW-C
Joseph Fuhrmaneck, MA, NCC, LCPC, PsA
Nancy Kluge, PhD
Daniel Marshall, JD, MA
Mutee Mulazim, BS/MS, PsA
Tracey Nicl, BSW, MA, MSW
Kate Thomas, PhD

**Clinical Affiliates:**
Shelly Lurie, MS, RN, CS-P
H. Martin Malin, PhD, FACCS

**Chief Administrator:**
Denise Sawyer

**Administrative Staff:**
Patrick Campbell
Madenney Carlisle
Gloria Chilcpat
Chenin Lewis

**Chief Legal Counsel:**
Mary Ann Berlin, RN, BS, JD

**Director of Research:**
Fabian Saleh, MD

**Board of Advisors:**
William Arthez
Judith Becker, PhD
Gail Berendzen, BS
Richard Berendzen, PhD
Gerald Boyle, Esq.
James Breiling, PhD
H. Jerome Briscoe, III, Esq.
James L. Cavanaugh, Jr., MD
David Finklehor, PhD
Robert Freeman-Longo
A. Nicholas Groth, PhD
Roy Hazelwood, MS
Thomas Kirk
Richard Lawlor, Esq.
Michael Melsheimer
Hon. Thomas J. Middleton
Jerome G. Miller, DSW, LCSW
John C. Nemiah, MD
P. Gayle O'Callaghan, PsyD
Jonas Rappeport, MD
Robert L. Spitzer, MD
Gary Ticknor, Esq.
Frank L. Valcor, MD
Henry N. Wagner, Jr., MD
Phyllis Ward, BA, MAT

## EVALUATION

**IDENTIFYING DATA:** The patient, a 54-year-old (DOB: 9-3-50), married, Caucasian male, has no prior criminal or psychiatric history. He is a resident of Fairfax Station, Virginia.

**CHIEF COMPLAINT:** The patient was referred for evaluation by his attorney, Whitney Ellerman, Esquire, after his computer at work had been seized by postal inspectors. Subsequent inspection yielded approximately 50 images of child pornography on the computer, as well as printed copies of those same images. At the time that the evaluation was requested, no criminal charges had been placed. Today's assessment was requested to assess whether or not the patient has a sexual disorder, to assess risk to the community, if any, and to obtain recommendations for any needed treatment.

**INFORMANTS:** The patient was the primary informant for today's evaluation. As he has not yet been criminally charged, no collateral information was available.

In addition, two standard psychological tests, the Millon Clinical Multiaxial Inventory-III and the Multiphasic Sex Inventory, were also administered.

**FAMILY HISTORY:** Father: The patient's father, John DiFazio, Sr., is 84 years of age. Considering his age, he is in satisfactory health although he does have bad knees, and he is unable to visit the patient as often as he did in the past. The patient is aware that his father had to leave high school early to help support his family, and that he subsequently earned his GED. He noted that his father does a lot of reading. Now retired, he had served during World War II, and he later worked as a mason. Characterizing him as "old school, an 'in charge' kind of guy," the patient further stated that he is nervous and, in the past, he had often drank quite a bit, generally on weekends. For that reason, while growing up, he had "hated weekends." Occasionally, his father would hit his mother while intoxicated. During the summer months, his mother would make him work with his father so that his father would not drink. However, when the patient and his wife adopted

1
**Fred S. Berlin, M.D., Ph.D.**
**104 E. Biddle Street**
**Baltimore, Maryland 21202**
**410-539-1661**

JOHN E. DiFAZIO, JR.
April 12, 2005

their children, his father stopped drinking, and he has been in recovery ever since. The patient said that his father loves his grandchildren. He indicated that he and his father get along "real good, especially since he stopped drinking."

Mother: The patient's mother, Josephine DiFazio, is 87 years of age. Although she has had some serious health problems, the patient advised that she is doing well and has remarkable energy. Approximately 20 years ago, part of her lung had been removed, and last year, she was diagnosed with colorectal cancer and required a colostomy. Having gone to nursing school, she had formerly been employed as a nurse. While the patient said that his mother has a "martyr complex," he also described her as "quite bright and very religious." He said that she had always stressed the importance of education. On three occasions, she had accompanied the patient and his wife on trips to Poland, including the two occasions when his children were adopted. He advised that the two children whom he had adopted were both born in the small town in Poland where his mother had been raised.

Siblings: The patient is an only child.

FAMILY HEALTH HISTORY:    According to the patient, there is a history of brain cancer, colorectal cancer, and high blood pressure among maternal relatives. He was unaware of any history of diseases among paternal relatives. Both sides of his family have a history of longevity.

SOCIAL POSITION & HOME    Born in Hartford, Connecticut, he had been 2
ATMOSPHERE:    years of age when his family moved to Derby, Connecticut. At first, his parents had rented the second floor of a home owned by a maternal aunt, which had had no heat or air conditioning. His aunt's three children, two boys and a girl, had been like siblings to him. He noted that his uncle "used to beat the kids pretty good." In 1964, when the patient was 14, his parents were able to build their own home nearby, and they continue to reside in it.

EARLY DEVELOPMENT &    The patient had no information about his
CHILDHOOD BEHAVIOR:    mother's condition during her pregnancy with him, but he believes that he had been born full-term, the result of a spontaneous vaginal delivery. He further believes that he had been a healthy infant who had reached his developmental milestones, such as walking and talking, at the expected times. He advised that he had been enuretic until somewhere between 6 and 8 years of age, but he denied any history of fire setting or of cruelty to animals.

2
Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661

**JOHN E. DiFAZIO, JR.**
**April 12, 2005**

As a youngster, he had enjoyed "anything to do with sports." He especially liked watching Yankee baseball games on television with his father. He tried Little League baseball but said that he had not been particularly good at it. He played touch football, participated in Boy Scouts, and also loved to read.

**HEALTH DURING CHILDHOOD:**    As a child, he had generally been healthy, except for the usual childhood illnesses. However, during the 2nd grade, he contracted ringworm and needed to have his head irradiated. As a side-effect, he lost his hair and took to wearing a hat. Other children would often teased him and forcibly remove his hat.

**CHILDHOOD PSYCHIATRIC**    None.
**HISTORY:**

**EDUCATIONAL HISTORY:**    Having begun kindergarten at 3 years of age, he had separated easily from his mother. He noted that he had started school at the same time as his older cousin, and that he had "held my own." He attended Catholic schools and advised that he had done quite well in elementary school. At his 8th grade graduation, he was the class valedictorian. For high school, he went to Fairfield Preparatory High School, a Jesuit school, where he continued to do well academically.

After graduating from high school graduation, he entered Lehigh University in Bethlehem, Pennsylvania, where he majored in chemical engineering. At first, his interest had been entering the space program, but over time, he became more interested in environmental work. He completed 12 credits toward a Master's in Public Administration from the University of Southern California and later completed the credits he needed for the degree after moving to Washington, DC. In 1979, he began law school at the Catholic University, later quitting his job to attend full-time. He received both his JD and his MPA in 1982.

**MILITARY HISTORY:**    He has not served in the military.

**OCCUPATIONS:**    From 1972 until 1976, the patient worked in the air pollution control unit of the Connecticut Environmental Protection Agency. From 1976 until 1979, he worked in Washington, DC, for the federal Environmental Protection Agency, leaving that position to then attend law school full-time. After graduating from law school, it took him one year to find a permanent job although he had done some work as an investment advisor during that

3

**Fred S. Berlin, M.D., Ph.D.**
**104 E. Biddle Street**
**Baltimore, Maryland 21202**
**410-539-1661**

**JOHN E. DiFAZIO, JR.**
**April 12, 2005**

period. In 1983, he began working for the Health Industry Manufacturer's Association in a part-technical, part-legal position. He stayed in that position for one year before accepting a position with the National Association of Realtors. After two years, he left there to work full-time as an investment advisor. However, in 1987 after the market crashed, he accepted a position with Consumer Specialty Products Association, his present employer, as assistant general counsel. He said that he has been a very productive worker, and that he has recently received an award. His employer is aware of the current situation since federal authorities had seized his work computer, but so far, he has not been let go. However, that could change if criminal charges are placed, and he is convicted.

| | |
|---|---|
| **LIVING SITUATION SINCE SEPARATION FROM FAMILY:** | The patient left his family's home to attend college. After graduating, he returned to his parents' home for two years before renting his own apartment. |

**PRESENT LIVING SITUATION:**    The patient and his family reside in a rented home in Fairfax Station, Virginia. In November 2004, he and his wife sold their home in Alexandria because they want their children to be able to attend Thomas Jefferson High School. They had been renting their home while looking for a house to purchase, and they had put a contract on a house when the present situation developed, and so they backed out of the contract.

**SEXUAL HISTORY:**    The patient said that he had not learned about sex as a young person, and that "this was part of the problem." He explained that he had been raised in a strict Catholic household, and that his parents had not discussed sex with him. The patient's family had lived next door to the church that they attended, and he had been an altar boy. Occasionally, he found magazines that his father had purchased, but he said that these had not been "raunchy, not even a *Playboy* magazine." He recalled that, if his mother had found him with one of those magazines, she had scolded him.

He first masturbated at around 11 years of age, and he had felt guilty about doing so. His sexual fantasies were just about "naked females, nothing specific." The females would be a little bit older than he would have been and, as he got older, so did the females in his fantasies. Sometimes he would look at a tabloid while masturbating or at an Archie comic book, imagining Betty and Veronica naked. In high school, some of his friends had *Playboy* magazines, and he would occasionally borrow them. However, after his mother found out and again yelled at him, he stopped bringing the magazines home.

Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661

JOHN E. DiFAZIO, JR.
April 12, 2005

In 8th grade the patient began to notice girls. He advised that, during his 8th-grade year, because of some school construction, classes were dismissed early during the week, and as a result, the students were mandated to attend Saturday classes. However, they had not been required to wear uniforms on Saturdays. He said that the girls "in regular clothes got my attention." However, the patient had been too shy to date, and he had only one blind date during high school, taking the friend of a buddy to a school dance. During the summer between his freshman and sophomore years in college, when he returned home he began to date girls whom he already knew, and he only dated one girl at a time. He did not date while he was at college. Prior to this, he had had no physical experiences with females. When he began to date, he engaged in kissing and fondling.

The patient advised that he had not had any serious relationships until he met his wife. He had engaged in intercourse for the first time at 24 years of age with a 34-year-old co-worker who had flirted with him. Although they had gone out on a few dates, he never considered them to be in a relationship.

The patient denies ever having been sexually victimized himself.

**MARITAL HISTORY:**      The patient met his wife, Debra, during the summer of 1977 when he was almost 27. After moving to the Washington, DC area, he had begun to play volleyball with his boss, and while doing so, he had met Debra who was his boss' wife's sister. Debra, who had been married at 19 and was divorced, had been 26 at the time. He said that he had been attracted to her because he had liked her smile. She could also talk about sports; she played volleyball; and she knew a lot about politics. In October 1978, they moved in together in a condo that the patient had purchased in Arlington, Virginia. Each tried to keep the fact that they were living together from their parents. They married in August 1979, and they have now been married for 25 years.

From the patient's perspective, it has been a happy marriage although they have had "a few rough spots." One had occurred approximately 10 years ago when Debra found the patient with some adult-themed pornographic tapes. In 1994 Debra became depressed following the death of her father, which was followed in May 2004 by the death of her mother. By December 2004, her depression had worsened, and she began to see a therapist. The recent discovery of the child pornography has also resulted in some discord in the marriage.

According to the patient, he and his wife have been sexually compatible "for the most part." However, for the last few years, they have not engaged in sex very often. He explained that they have been too busy raising their children and being involved in their children's activities. However, he also remarked that, "I could have been more affectionate toward my wife."

5

Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661

JOHN E. DiFAZIO, JR.
April 12, 2005

**CHILDREN:** The patient and his wife have two adopted children from Poland, both from the same town. Each was adopted at only a few months of age. The patient explained that he had started law school two weeks after he and his wife married. Because they knew that they could not afford children at that time, the patient had had a vasectomy, thinking it could be reversed if they later decided to have children. However, when they did decide to have children, he did not try to have the vasectomy reversed, instead they decided to adopt.

Stefan is 15 years of age. He described him as "a good kid, very diligent" although he has been "acting out a little as a teenager." He attends Thomas Jefferson High School where he is in Gifted & Talent classes, and he is involved in soccer, baseball, golf, wrestling, and acting. The patient indicated that he has a "terrific" relationship with his son.

Alina, who is 13 years of age, was born 3 months premature, weighing less than 3 pounds. As a result, she had been hospitalized for the first 6 weeks of her life. As the patient understands it, her birth mother did not abuse any alcohol or drugs during her pregnancy with the child, but she had suffered from poor nutrition. Her birth mother contacted the woman who had brokered the adoption of the patient's son to see if the patient and his wife would adopt her child when it was born. She had other children and could not afford to raise another. After the child was born, she had a hysterectomy. Initially, Alina had been developmentally delayed, not starting to talk until 27 months of age. However, she seems to have caught up and is now a 'B' student. Her only physical shortcoming is poor eyesight, which is corrected by glasses. Alina plays soccer, and the patient noted that he has only missed two of her games.

**HABITS:** The patient denied smoking cigarettes or ever using any illegal substances. Occasionally, he will drink wine.

**RELIGIOUS AFFILIATION & INTEREST:** Raised as a Roman Catholic, he advised that he now only occasionally goes to church.

**PERSONALITY BEFORE ILLNESS:** Describing himself as moderately sociable, he further stated that he does not like to go to parties. However, once there, he usually had a good time. Regarding his mood, he said that he is upbeat and comedic, trying to accomplish a lot with a sense of humor. He continues to be interested in sports, and he had been involved in nine fantasy baseball leagues. As a result of the current

Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661

JOHN E. DiFAZIO, JR.
April 12, 2005

situation, he has dropped out of 6 of these.   He enjoys going to soccer games with his daughter, and he also likes attending plays.

**MEDICAL HISTORY:**                          The patient is healthy.

**LEGAL HISTORY:**                            According to the patient, he has never been charged with a criminal offense as either a juvenile or an adult.

**PREVIOUS PSYCHIATRIC
HISTORY:**                                    Approximately 10 years ago, the patient and his wife engaged in marital counseling for 2 or 3 months.  He said that it had been useful.

**HISTORY OF PRESENT
ILLNESS:**                                    Because the patient has not been criminally charged, an official version of the alleged offense was not available.
According to the patient, about 10 to 12 years ago, he had purchased some pornographic videos, all of which had been adult-themed.  When his wife found them, she had been upset, as she does not approve of pornography.  He threw the videos away, and he and his wife went to counseling together for 2 or 3 months.  About 4 years ago, while on the Internet at work, "something popped up," and he went to an adult pornography site.  He cannot explain how, over time, he went from adult to child pornography, except that it was "just something different," and the "illegality of it...but not on a conscious level."  He acknowledged that his first exposure to child pornography had been accidental, just by going from one link to another.  However, with time, he began to purposefully look for child pornography.  He also admitted to saving some of the images, stating, "It became a game. I'm a compulsive saver."  Because of the incident that happened 10 years ago with the adult pornography, the patient only accessed pornography on his computer at work.  He did not masturbate while looking at the pornography, but sometimes he would go to the bathroom and masturbate after he had finished viewing the child pornography.

The patient was discovered when he responded to an advertisement on the Internet to purchase a child pornography DVD.  He said that this had been the only time that he had done so.  The DVD was described as depicting three children and an adult, maybe a father.  He had chosen it because it had contained more children than the others, which had also been advertised for sale, not because it had an incest theme.  The offer was actually an undercover operation.  On March 23, 2005 after the DVD had been delivered to him at work by the Postal Inspector, his computer was seized.   Subsequent

7

JOHN E. DiFAZIO, JR.
April 12, 2005

examination indicated approximately 50 images of child pornography on his computer, and 50 printed copies of child pornography images. His home computer was also seized, but no child pornography was discovered on it. According to the patient, some of the images depicted children having sex with other children, and some depicted children having sex with adults. He denied any sadism in the images although there were one or two in which a young girl may have been suffering some discomfort as her hand is on her forehead. He said that he had not been attracted by the sense of discomfort, but that it was just another image of a child. He preferred images of girls to images of boys.

The patient said that his work had not been affected by his viewing of pornography. He is usually the first one in, and he always begins working right away. Because he is so productive at work, his sense that he was doing nothing wrong had been reinforced. At times, he would view pornography for about 15 minutes, as if he were taking a coffee break. That happened 2 to 3 times per week. He admitted that he had found the images of children "titillating," and that the bulk of what he saved were images of child pornography. At the time, he did not view looking at child pornography as harmful or as a problem. Now, he does realize that children had been harmed in the production of child pornography, and that they are continually exploited whenever the images are viewed. He said that the Postal Inspector who came to his home "set me straight." When the Postal Inspector asked him how he would feel if that was his daughter in the images, "it hit me like a 2x4." He is aware that others at work could access his computer, but he was not concerned because he considered his behavior harmless. He is not sure that he would have stopped on his own if he had not been caught.

The patient denied ever engaging in chat room discussions with anyone, minor or adult. He denied feeling a sexual attraction towards his own children. At the request of his attorney, he took a polygraph regarding this question and reportedly was deemed to be truthful.

The patient said that he is feeling contrite for, and embarrassed by, his behavior. He is also very frightened as to how his family will be affected. Even though his wife is very opposed to pornography, she has been "incredibly understanding" and supportive of him. His children have only been told that he is involved in an issue at work and could possibly lose his job. He is aware that, if he is convicted of an offense, he could be disbarred. Even though he has resolved never to look at child pornography again, he is willing to start treatment to aid him in the process.

**MENTAL STATUS EXAMINATION:**    The patient seemed to be of above average intelligence. There was no evidence of cognitive impairment, formal thought disorder, or perceptual disturbance. His mood was mildly depressed and affect anxious, nervous, at times tearful, but friendly and appropriate to the topics under discussion. No suicidal or homicidal ideation was elicited. He admitted that

8

Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661

JOHN E. DiFAZIO, JR.
April 12, 2005

he had been suicidal immediately after federal authorities had executed the search warrant, and that it had been "rough for a week." However, he said that he could never put his family through the ordeal of dealing with his suicide. Throughout the evaluation, the patient was fully cooperative. It is our sense that he is genuinely remorseful.

On the Millon Clinical Multiaxial Inventory-III, the patient's response style in answering test questions appeared to be open and honest, and no response distortions appeared evident. The results of this test, therefore, are likely to be valid. The results on the clinical scales were generally within normal limits except for a moderate elevation on the scales assessing schizoid traits, suggesting that he may have a low need for social involvement, preferring fantasy and daydreaming. He may also be asexual.

The results of the Multiphasic Sex Inventory also appear to be valid. He endorsed responses suggesting that he has normal sexual desires and interests, and that he generally takes responsibility for his behavior.

| DIAGNOSES: | Axis I | (CLINICAL DISORDERS): |
| | | Paraphilia Not Otherwise Specified with elements of both voyeurism and pedophilia, the pedophilia in fantasy only |
| | | Reactive Depression with some suicidal ideation |
| | Axis II | (PERSONALITY DISORDERS OR MENTAL RETARDATION): |
| | | V71.09  No Diagnosis |
| | Axis III | (GENERAL MEDICAL CONDITIONS): |
| | | No Disorder |
| | Axis IV | (PSYCHOSOCIAL AND ENVIRONMENTAL PROBLEMS) |
| | | Threat of arrest, criminal prosecution, incarceration, and loss of job |
| | Axis V | (GLOBAL ASSESSMENT OF FUNCTIONING Scale = 1 to 100; 100 is superior.) |

9

Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661

JOHN E. DiFAZIO, JR.
April 12, 2005

GAF = 70 (current)

**FORMULATION & TREATMENT RECOMMENDATIONS:** The results of today's evaluation indicate that the patient has a paraphilic disorder characterized by a desire to view images of children. Thus, there is both a voyeuristic and a pedophilic component, but the pedophilia is in fantasy only. The voyeurism is the intended end; it is not a means to an end. That is, the patient is not viewing child pornography as a prelude to being with an actual child. He has a prior history of looking at pornography although, by his account, that had all been adult-oriented. The government has seized and examined his computer and, to date, has not alleged that the patient engaged in any chat room discussions with minors, or that he had done anything to actually plan a meeting with a minor for sexual purposes.

It seems that the patient has learned a very painful lesson, and the risk of him re-offending, even without treatment, is low. The patient has two children and apparently passed a polygraph concerning having a sexual interest in them. He denies any sexual interest in children, and as an adult, he has never been sexual with a child. Neither has he ever disregarded the welfare of a child. He had not previously appreciated that a child could be harmed in the production and dissemination of child pornography. Now that he understands this, he is resolved to never view child pornography again. However, we do think that it is better to err on the side of safety, and therefore, we are recommending that he begin attending groups at our specialized clinic in order to help him understand his behavior better, to help him develop relapse-prevention techniques, and to provide him with support him through the current situation. The patient seems to be socially naïve, rather than malicious or manipulative. Additionally, he does not have any substance abuse issues or major psychiatric disturbances, which could complicate treatment, and he is not a failure of prior treatment. He is very suitable for community-based sex-offender-specific treatment. We have successfully treated patients who have had significantly greater psychiatric vulnerabilities, and in our professional opinion, the patient is certainly at the low end of the risk continuum. At this time, we do not view the patient as needing antiandrogenic (sex-drive-lowering) medication.

The patient also seems to have undergone a reactive depression with some suicidal ideation, which is now largely resolved. We feel that the support of the group could also help with this. We are also suggesting that marriage counseling be considered. Although the patient and his wife seem to have a solid marriage, there has not been much intimacy for a number of years, and this should be addressed.

The above recommendations were discussed with the patient. He is in agreement and will start group therapy on April 21, 2005.

Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661

JOHN E. DiFAZIO, JR.
April 12, 2005

Published recidivism rates from this clinic have documented less than an 8% recidivism rate over a 5-year-plus follow-up period. Better than 92% of the men treated did not recidivate. This clinic has been designated as a National Resource Site by the United States Department of Justice, in part, because of its success in treating persons with sexual disorders, and other related conditions, safely in the community.

Phyllis Ann Burke, M.A., LCPC
Certified Sex Offender Treatment Specialist (CSOTS)
Staff Affiliate

Fred S. Berlin, M.D., Ph.D.
Associate Professor, The Johns Hopkins University
   School of Medicine
Founder, The Johns Hopkins Sexual Disorders Clinic
Director, National Institute for the Study, Prevention
   and Treatment of Sexual Trauma

| | |
|---|---|
| 04/21/05 | FIRST GROUP |
| 05/20/05 | SIGNED TREATMENT CONTRACT |
| 12/12/05 | LETTER A |
| 06/20/06 | SCD CHG LT |
| 04/24/07 | He currently attends Richard Feldman's 5:30 group on Thursdays qow. |
| | Depo-Lupron: No |
| | Probation: No |
| | Charges have just recently been pressed. |

Fred S. Berlin, M.D., Ph.D.
104 E. Biddle Street
Baltimore, Maryland 21202
410-539-1661



**National Institute for the Study, Prevention and Treatment of Sexual Trauma**

104 E. Biddle Street
Baltimore, MD 21202
Phone: (410) 539-1661
Fax: (410) 539-1664
e-mail address: berlinf@aol.com

**Director:**
Erad S. Berlin, BS, MA, MD, PhD, PA

**Therapists:**
Phyllis Burke, MA, LCPC
Danni Davis, LCSW-C
Joseph Fuhrmaneck, MA, NCC, CPC, PsA
Mutee A. Mulazim, BS, MS, PsA
Tracey Niel, BSW, MA, MSW
Kathryn Thomas, RN, PhD, CS-P

**Clinical Affiliates:**
Shelly Lurie, MS, RN, CS-P
H. Martin Malin, PhD, FACCS

**Chief Administrator:**
Denise Sawyer

**Administrative Staff:**
Joseph Brown
Patrick Campbell
Madenney Carlisle
Gloria Chilcoat

**Chief Legal Counsel:**
Mary Ann Berlin, RN, BS, JD

**Director of Research:**
Fabian Saleh, MD

**Board of Advisors:**
William Arthez
Judith Becker, PhD
Gail Berendzen, BS
Richard Berendzen, PhD
Gerald Boyle, Esq.
James Breiling, PhD
H. Jerome Briscoe, III, Esq.
James L. Cavanaugh, Jr., MD
David Finklehor, PhD
Robert Freeman-Longo
A. Nicholas Groth, PhD
Roy Hazelwood, MS
Wayne P. Hunt, EdD, NCSP
Thomas Kirk
Richard Lawlor, Esq.
Michael Melsheimer
Hon. Thomas J. Middleton
Jerome G. Miller, DSW, LCSW
John C. Nemiah, MD
P. Gayle O'Callaghan, PsyD
Jonas Rappeport, MD
Robert L. Spitzer, MD
Gary Ticknor, Esq.
Frank L. Valcor, MD
Henry N. Wagner, Jr., MD
Phyllis Ward, BA, MAT

December 27, 2005

Whitney Ellerman, Esquire
Janis, Schuelke & Weschler
1728 Massachusetts Avenue, NW
Washington, DC 20036

RE: John DiFazio

Dear Mr. Ellerman:

This letter of progress is being written on behalf of, and at the request of your above-noted client. It is our understanding that this letter may be used to provide an update on his treatment progress, and to make recommendations for his continued mental health needs. It may also be used to assist in determining his risk to the community, if any, and it may assist in determining an appropriate level of intervention, based upon Federal Sentencing Guidelines, should he be found guilty of his current charges.

Mr. DiFazio was initially evaluated here on April 12, 2005. Since then, he has been attending weekly, specialized, group psychotherapy sessions. At the time of his initial evaluation, he was diagnosed with Paraphilic Disorder (a Sexual Disorder), Not Otherwise Specified, and a Reactive Depression. Even though he was considered to be of low risk to the community, based upon his history and presenting problems, it was recommended that he begin specialized treatment in order to help him better understand his behavior, develop effective relapse prevention techniques, and to provide him with emotional support through his current legal situation.

Over the course of treatment, Mr. DiFazio has consistently attended group psychotherapy sessions, and he appears to have been forthcoming regarding his sexual problems. At no time has he minimized the seriousness of his sexual disorder, and he has approached therapy in a mature and committed manner. In our professional opinion, Mr. DiFazio has displayed a genuine sense of guilt, shame, and remorse, accompanied by a desire to make amends to his family and the community. He has impressed us as being well motivated and willing to follow all suggestions made in therapy sessions.

In our judgement, Mr. DiFazio continues to present as a low risk to others, and we believe that he can benefit from continuing to receive treatment here. While we fully appreciate the seriousness of his current legal charges, we have seen no reports, or other indications, that he has ever engaged in any inappropriate hands-on behaviors with children. We have also seen no evidence that he has ever attempted to communicate with children, either via chat rooms or otherwise, for sexual purposes. To the best of our knowledge, Mr. DiFazio's sexual problems have been

Whitney Ellerman, Esquire
RE:  John DiFazio
December 27, 2005 – Page 2

voyeuristic in nature (i.e., looking at pictures) only.  His voyeuristic urges do not appear
to have a driven quality of the sort that would indicate a need for sex-drive-lowering
pharmacological treatment at this time.  Mr.
DiFazio's depression has also been well managed, although he should be monitored
closely as he is dealing with multiple psychosocial stressors.

In summary, Mr. DiFazio has been a very compliant and cooperative patient at this
clinic, and he has been willing to follow all treatment recommendations.  He has
become a vital member of his therapy group, and he has gained insight and knowledge
regarding his sexual disorder.  It is our understanding that Mr. DiFazio is facing possible
incarceration based upon Federal Sentencing Guidelines.  However, in our clinical
judgement, he is amenable to community-based treatment in a fashion that will not pose
a risk to others.  Were he to be allowed to remain in the community, he could continue
to work full-time and to provide for his family, while receiving specialized care here.  If
there is any alternative form of holding Mr. DiFazio accountable and monitoring him,
while allowing him to remain in the community, perhaps for example via home detention
with work-release, this clinic would be willing to continue providing him with treatment,
and to provide any necessary updates and progress reports as requested.  As is our
policy, were he to be required to attend treatment here as a condition of probation, any
noncompliance would be reported to the appropriate probationary authority.  This clinic
has been designated as a "National Resource Site" by the United States Department of
Justice, in part, because of its success in treating individuals with sexual disorders
safely in the community.  Published recidivism rates have been less than 8%.

We trust that this information will prove useful.  Should you require any additional
information at this time, please do not hesitate to let us know.  Thank you very much.

Sincerely,

*Danni Davis*

Danni Davis, LCSW-C
Psychotherapist and Staff Affiliate

*Fred Berlin*

Fred S. Berlin, M.D., Ph.D.
Associate Professor, The Johns Hopkins University
  School of Medicine
Founder, The Johns Hopkins Sexual Disorders Clinic
Director, National Institute for the Study, Prevention
  and Treatment of Sexual Trauma

Copy:  File



**National
Institute
for the Study,
Prevention and
Treatment of
Sexual Trauma**

104 E. Biddle Street
Baltimore, MD 21202
Phone: (410) 539-1661
Fax: (410) 539-1664
e-mail address:
fredsberlinmd@comcast.net

**Director:**
Fred S. Berlin, BS, MA, MD, PhD, PA

**Therapists:**
Lyndel Blais, LCSW-C
Phyllis Burke, MA, LCPC
Richard Feldman, LCSW-C
Joseph Fuhrmaneck, MA, NCC, LCPC, PsA
Nancy Kluge, PhD
Daniel Marshall, JD, MA
Mutee Mulazim, BS, MS, PsA
Tracey Nicl, BSW, MA, MSW
Kate Thomas, PhD

**Clinical Affiliates:**
Shelly Lurie, MS, RN, CS-P
H. Martin Malin, PhD, FACCS

**Chief Administrator:**
Denise Sawyer

**Administrative Staff:**
Patrick Campbell
Madenney Carlisle
Gloria Chilcoat
Chenin Lewis

**Chief Legal Counsel:**
Mary Ann Berlin, RN, BS, JD

**Director of Research:**
Fabian Saleh, MD

**Board of Advisors:**
William Arthez
Judith Becker, PhD
Gail Berendzen, BS
Richard Berendzen, PhD
Gerald Boyle, Esq.
James Breiling, PhD
H. Jerome Briscoe, III, Esq.
James L. Cavanaugh, Jr., MD
David Finklehor, PhD
Robert Freeman-Longo
A. Nicholas Groth, PhD
Roy Hazelwood, MS
Thomas Kirk
Richard Lawlor, Esq.
Michael Melsheimer
Hon. Thomas J. Middleton
Jerome G. Miller, DSW, LCSW
John C. Nemiah, MD
P. Gayle O'Callaghan, PsyD
Jonas Rappeport, MD
Robert L. Spitzer, MD
Gary Ticknor, Esq.
Frank L. Valcor, MD
Henry N. Wagner, Jr., MD
Phyllis Ward, BA, MAT

August 21, 2007

Whitney Ellerman, Esquire
1900 K Street, NW
Washington, DC 20006-1109

**RE:    John DiFazio: Progress Report and Recommendation**

Dear Mr. Ellerman:

This report is written in response to your request for a Progress Report on your above-noted client's participation, compliance and progress while receiving therapy at the National Institute for the Study, Prevention and Treatment of Sexual Trauma (herein referred to as the "Institute"). In addition, after our discussion, you had asked that I render a sentencing recommendation. This is in light of my twenty-six (26) years of service as a Federal Probation Officer (District of Columbia, District of Maryland) where I worked as a Mental Health Treatment Specialist and Senior United States Probation Officer. As my attached resume reflects, I had been assigned a caseload of special needs offenders, including sex offenders.

I understand that you may supply this Report to the Court at the time of sentencing.

## Sources

I interviewed the relevant individuals listed below and reviewed the following documents for this report:

1. John E. DiFazio, Jr. (defendant/patient)

2. Deborah Bell (defendant's wife)

3. Theresa M. Shaltanis, M.A., LPC (marriage therapist for the patient and his wife)

4. National Institute initial evaluation, conducted by Phyllis Ann Burke, M.A., LCPC, and Fred S. Berlin, M.D., Ph.D., dated April, 12, 2005

5. Tests administered during the National Institute initial evaluation: the Millon Clinical Mutiaxial Inventory-III and the Multiphasic Sex Inventory

6. the Presentence Investigation Report dated June 4, 2007 for the United States District Court of Columbia

Whitney Ellerman, Esquire
RE: John DiFazio
August 21, 2007 – Page 2

## Patient's Background

Mr. Difazio's social history is available in his Evaluation, which the Institute provided to you. In addition, the Federal Probation Officer assigned to the Presentence Investigation in this matter has given a description of the defendant's background to the Court in the appropriate section of his Report. However, the following is a summary of what I have learned and which I consider relevant to understanding Mr. Difazio's paraphilia and forecasting his future outcome.

## Offense/Presenting Problem

According to the Presentence Report in this matter, Mr. DiFazio has entered into a plea agreement with the government in which he agreed to plead guilty to a one count Information charging him with Certain Activities Relating to Material Constituting or Containing Child Pornography, in violation of 18 USC 2252(a)(5) and (b)(2). Specifically, Mr. DiFazio is said to have ordered a DVD by mail containing sexually explicit conduct between minor girls with a minor girl and adult. He paid $20 for this material, which had actually been compiled by the U.S. Postal Service. The DVD was mailed to his workplace.

In addition to the above, the patient's computer at work was examined and was proven to contain 458 images of child pornography. Included in the collection were sado-mashostic images of a six year old girl. The patient printed some of the images on paper as well as saving images on a hard drive file in his computer.

## Family History

As reflected within the evaluation, and as discussed by the patient in group sessions, the DiFazio family has been described as fairly rigid with a strong sense of religious (Catholic) tradition. The patient describes his mother and father as working class individuals who were devout Catholics probably stemming from their ethnic backgrounds as Italian (father) and Polish (mother). While his mother, Josephine, aged 89, worked as a nurse. His father, John DiFazio, Sr., (aged 86, deceased this year) was a WW II veteran who was employed as a mason until his retirement. The DiFazios had no other children (reasons unknown).

Mr. DiFazio has noted, with some irony, that the family lived next to a Church. He described his mother as having a "martyr complex" about suffering and seemed to be habitually angry. Repression of sexual thoughts and things thought to be uncomfortable was commonplace. The patient indicated that tension permeated the family atmosphere; most likely because his father had a serious problem with alcohol and often assaulted the patient's mother. The father's alcohol consumption ended around the time the patient and his wife adopted children.

Whitney Ellerman, Esquire
RE: John DiFazio
August 21, 2007 – Page 3

The patient has reflected during therapy that his father's alcoholism and periodic abuse of his mother was a constant source of internal turmoil while growing up. Sometimes he retreated to his grandmother's house on weekends or stayed with an aunt. He stated that he dreaded weekends, as that would be a time that his father and mother would exhibit increased tensions. His mother often asked him to attend work with his father in order to inhibit his alcohol use while working.

These difficulties with his parental environment most likely contributed to the patient's current sexual tendencies and will be discussed later in this report.

## Social History and Relevant Experiences

John E. DiFazio, Jr. was born on September 3, 1950 in Hartford Connecticut. He lived in Connecticut through adolescence until he attended college. His parents lived in a rented home, shared with relatives, until John was 14 years old. It was a significant factor to the patient that his cousins lived in the same house as his family and that they (his cousins) faced severe beatings and abuse at the hands of their father, the patient's uncle. As an only child, he viewed his cousins as siblings and considered his own family as not as dysfunctional as theirs. His parents eventually built a home nearby, where the family moved, and have lived there ever since.

Except for the above, the patient reports a childhood as "average". He attended Catholic parochial schools and achieved academically in High School. He participated in a few sports activities including touch football and little league baseball. He was also in Boy Scouts. However, Mr. DiFazio indicates that he has always been a shy individual and somewhat withdrawn. For this reason, he did not date girls in high school and only dated rarely while home from college. He did not go out with girls while attending college.

Mr. DiFazio attended Lehigh University, where he majored in chemical engineering. He later obtained a Masters in Public Administration from the University of California. His JD in law was accomplished after attending Catholic University and graduating in 1982.

Mr. DiFazio worked for government agencies in environmental issues from 1972-1980 until his attendance in law school and graduate school. He held other jobs in positions as analyst in real estate and private industry, culminating in his appointment as general counsel to the Consumer Specialty Products Association (private lobbying company) from 1988 until his forced retirement in 2007. It should be noted that he used his computer to download pornography while working at this job. Although his employer was aware of his pending criminal charge, he continued to work there for almost a year after his illegal activities were discovered.

Whitney Ellerman, Esquire
RE: John DiFazio
August 21, 2007 – Page 4


## Marital Background

I believe the patient's relationship with his wife, Deborah Bell, is very significant, given the length of this relationship and the impact it could have on his future behavior.

Mr. DiFazio met his wife in 1977, who was the sister-in-law of his boss. After dating, they began living together and subsequently married in 1979. Ms. Bell (she prefers to use her maiden name) was married previously.

The patient reports their relationship as primarily harmonious. He considers their sexual relationship during most of their marital history as normal and they planned on having children when he completed law school. However, he found it necessary to undergo a vasectomy after his wife-experienced reactions to birth control pills. It was their plan to reverse the procedure when their lives became more structured and financially secure. They eventually settled on adoption.

The patient and his wife have two adopted children: Stefan, age 18, who attended public school and has been accepted to the University of Virginia in fall '07. Alina, age 15, attends a school where Ms. Bell is employed as a math teacher. Both children were adopted after being born in Poland. Stefan is described as bright and above average, while Alina was a premature birth and has some learning disabilities, yet is otherwise doing well. The parents seem devoted to their children and are very protective. The patient informed his children of his pending criminal case after his arraignment.

Mr. DiFazio's relationship with his wife suffered its first dramatic setback when he began buying adult pornographic tapes in 1993. His wife discovered this and became very upset. He agreed to enter counseling and attended six (6) sessions with a therapist. In his words, the therapist saw his interest as normal and counseled him on how to "deal with his wife" and her reactions. However, his current legal predicament, in his eyes, had caused his wife to cast doubt on his ability to change. Subsequent to entering marital therapy, Ms. Bell has again become supportive and optimistic about their relationship.

Ms. Bell was interviewed. She corroborated the background given by her husband. She described their lives as centered around his work and the raising of their two children. In fact, after working as a teacher and then with the Government Accounting Office, she quit work and stayed at home for thirteen (13) years to maintain their home and raise their children. She noted that her husband was almost a workaholic and was content for her to handle many family issues. However, after he retired from his last employment, she has had to return to the education field and now works full time as a high school math teacher. He stays at home handling more household functions.

Whitney Ellerman, Esquire
RE:  John DiFazio
August 21, 2007 – Page 5

Ms. Bell described their marital life as basically good until he was found to be involved in viewing pornography. In fact, the first episode in 1993 almost led to their separation, however, his attendance in therapy helped her to adjust. The later discovery of his interest in child pornography was quite unsettling and even "shocking." However, she was willing to go into marital therapy with him (see Counseling History) and is now more supportive.

Ms. Bell did indicate her strong concern regarding her husband's activities related to pornography. As a direct result of this discovery their sexual intimacy has been affected.  She feels very secure that he has not had sexual contact with their children and is confident that his contact with other children has been normal. She knows that he faces imprisonment, yet hopes that his sentence would be minimal so that he could contribute financially to the family and so their children would not be hurt.


**Counseling History**

**Prior Therapy**

As previously stated, the patient enrolled in individual counseling in 1993 after his wife discovered that he had been viewing adult pornography on videotapes. He reported seeing the therapist six (6) times and indicates that the therapist did not see his interest as problematic.  No documentation was available.

**The Institute**

The patient was evaluated, at his attorney's request, in April ,2005. His evaluation concluded that he met the DSMI IV-R Axis I criteria for Paraphila Not Otherwise Specified (NOS) for voyeurism and pedophilia, the pedophilia in fantasy only. Also, he was believed to have Reactive Depression with some suicidal ideation.  He was not seen as having a Personality Disorder. In addition, his testing indicated low social involvement "preferring fantasy and daydreaming."

Mr. DiFazio is a patient and receives group therapy in ninety (90) minute sessions at the Institute in Baltimore. He began weekly treatment on April 21, 2005 and was then permitted to attend bi weekly beginning on June 1, 2006.  I have been his therapist since February, 2006.

While in therapy Mr. DiFazio exhibited shyness with some withdrawn personality traits. He was not talkative and it seemed, at first, difficult for him to share his problems with group members. Yet, he has been increasingly able to exhibit acceptance of others and offer information about himself. He was also extremely helpful and supportive to others.

Most importantly, the patient has verbalized both insight and remorse. Specifically, he has come to understand that his repressed sexuality derived from his family background and evidenced

Whitney Ellerman, Esquire
RE: John DiFazio
August 21, 2007 – Page 6

throughout his personal history, had expressed itself in an almost obsessive interest in pornography. Eventually, he required an ever increasing and heightened sexual arousal through viewing child pornography. He engaged in rationalizing his behaviors, which was a form of "cognitive distortion", often found among patients who engage in illegal sexual activities. However, he has repeatedly, in therapy, accepted his role and responsibility in the continued exploitation of children by viewing child pornography. He also shows a fundamental interest in remaining in therapy so as to prevent a relapse. He has consistently verbalized his intention to reassure his wife that he will not engage in viewing pornography of any kind. He knows that his triggers are stress, avoiding family intimacy and private time with a computer.

During therapy, one of my concerns has been the patient's thoughts of hopelessness as a result of his legal problems in Federal Court. These have been addressed throughout therapy and he seems to understand and accept that possibility of imprisonment. It seems that he is aware of his periodic episodes of depression yet believes that he needs to be strong for his family, avoid suicidal ideation and seek immediate assistance if he experiences suicidal thoughts.

### Marital Therapy with Theresa Shaltanis, LPC

The patient and his wife attended marital counseling with Ms. Shaltanis beginning March 14, 2006 for a total of 34 sessions. Ms Shatanis has collaborated with me on several occasions while discussing Mr. Difazio's issues and family problems. She believes that he has made a great deal of progress in gaining insight into the causes of his use of adult and child pornography. She has seen no sign of additional interest in children. Almost more importantly, she thinks that Ms. Bell has grown more supportive of her husband while showing a greater interest in maintaining their marriage. These are strong factors in preventing further outbreaks or symptoms of his illegal interest in child pornography.

### Conclusions and Recommendation

I understand, from my experience as a Senior U.S. Probation Officer, that the Court will have as sentencing goals: punishing an offender, deterring future criminal behavior, and also general deterrence. It is especially important, with regards to sex offenders, to try to achieve these objectives so as to assure the future safety of other potential victims. In some cases patient/offenders may actually benefit from incarceration if a patient/offender has maintained a high level of rationalization or if there is a biological or chemical "need" for sexual deviant behavior. Although rarely available, sex offender treatment during imprisonment would be considered essential.

Despite Mr. DeFazio's many achievements: obtaining a Masters in Public Administration; acquiring a Juris Doctorate in law; employment, with the exception of schooling, from 1976-2007; and adopting children and establishing a family life; he engaged in activities which

Whitney Ellerman, Esquire
RE: John DiFazio
August 21, 2007 – Page 7

contribute to the exploitation of children. The most immediate outcome of his paraphilac interests have included the forced retirement from his job, almost certain disbarment, possible dissolution of his marriage and impairment of his family structure. He faces a lengthy term of imprisonment: 63 to 78 months according to USSG Chapter 5, Part A (U.S. Sentencing Guidelines).

In my view and experience, prevention of dangerous behavior usually involves the presence of remorse, insight, family support and relapse prevention plans. In this particular case these elements are present as expressed by the patient, his wife, his other therapist and by Mr. DiFazio's consistent behavior since his exposure.

The following are additional reasons why my concerns regarding his reoffending are low. They are:

- There is no testimony or evidence that Mr. DiFazio has had physical contact with juveniles.

- The stress of his employment and concomitant workaholic lifestyle has been eliminated by his retirement.

- His involvement in therapy has assisted him in a greater understanding of his motivations in viewing pornography thus likely impeding future similar behaviors.

- His expressions of empathy for the victims of child pornography have been consistent and seem sincere.

- The "outing" of his interest in pornography and his escalation into child pornography is both an elimination of a causal factor and a deterrent toward future Internet voyeurism.

- The improvement in his marriage and subsequent marital therapy has diminished causal factors related to stress.

Given the above, the Guidelines seem excessive. Certainly the length of incarceration of approximately 5 years or more is extreme given the presence of a clinical condition, which stems from Mr. DiFazio's psychological development and which has not been shown to involve physical danger to anyone. Furthermore, Mr. DiFazio has shown a strong willingness to continue his participation in treatment for his sexual disorder: participation which began long before his arraignment in this case.

I would recommend that sentencing in this matter be commensurate with the crime committed and, as indicated in 18USC 3553 (a), reflect the "history and characteristics of the defendant."

Whitney Ellerman, Esquire
RE: John DiFazio
August 21, 2007 – Page 8

Any confinement could be reduced by an extended period of home confinement and electronic monitoring. In addition, our Institute often provides therapy under such circumstances, which could include intervals of polygraphy. This would be an additional deterrent while also serving as a monitoring device whose results would be available to U.S. Probation in their eventual supervision of the patient.

I trust that this information will prove useful to you and to the Court. Should you require any additional information at this time, please do not hesitate to let me know. Thank you very much.

Sincerely,

Richard Feldman/dgs

Richard Feldman, LCSW-C
Staff Affiliate and Psychotherapist

Copy: File

Enclosure: Resume of Richard Feldman, LCSW-C

# Cornerstone Family Counseling, P.C.

10372B Democracy Lane • Fairfax, VA 22030 • Tel: (703) 591-2551 • Fax: (703) 591-2563 • www.cornerstonecounseling.org

May 24, 2007

Mr. Michael Penders
Probation Officer, US District Court
E. Barrett Pettyman
United States Courthouse
333 Constitution Avenue NW, Room 2800
Washington, D.C.  20001-2866

### RE:  JOHN E. DIFAZIO, JR.

Dear Mr. Penders,

      This letters comes in response to a request from the United States District Court for medical history data for John E. DiFazio, Jr.  Mr. DiFazio and his wife, Debra Bell, sought services with me for outpatient marriage counseling.  My first session with them was March 14, 2006, and we have had a total of 35 sessions, each an hour in length, usually scheduled two weeks apart.  Two of those sessions were individually with Debra, ten were individually with John (esp. at times when Debra was not able to attend our scheduled session due to work commitments), and 23 of the sessions were with the couple.

      John and Debra presented for treatment for marital distress following John's discovery by government officials for ordering pornography that contained images of children.  As I began work with this couple, the diagnosis was V61.10, Partner Relational Problem.  They have been married about 28 years and have two children who are in high school.

      As the focus of your work is with John, I will highlight his participation in therapy.  I have found that John has always been an involved & willing participant in the therapy process, never missing sessions and even coming on his own if his wife was not available or if individual sessions were recommended by me to sort through family history and its impact on his life.

      John has a very good understanding of the emotional landscape that led to poor choices involving pornography.  He shared of significant parental conflict (verbal & physical) and paternal alcohol abuse while growing up as an only child.  He began to view pornography as a child to escape from the powerlessness, shame, and isolation he felt from his dad's alcohol abuse & gambling and his mother's sending him after his dad

to make sure he came home with his paycheck and stayed away from temptation. Being pushed into the adult role of supervising his father, John developed beliefs that he was alone and that he couldn't turn to others for help. These beliefs continued into marriage, as he didn't turn to his wife for closeness when he was under stress or hurting.

Pornography viewing was an on-again, off-again behavior that continued even into John's marriage. It continued to serve as an escape from the stressors of life and a replacement for the emotional closeness lacking in John & Debra's marriage.

John is very remorseful for his actions and for the energy he did not put into maintaining and building his marital relationship. He clearly accepts full responsibility for his actions—making no excuses or justifications for his poor choices. During my time with this couple, John has made substantial changes that demonstrate his ability to be truly invested in his wife and family. Debra has been moved by his consistent changes and forgiven her husband, desiring a future with him. They both report that their relationship has never been as honest or supportive as it is now.

I do not believe that John is a threat to society regarding child pornography or sexually inappropriate behavior. John has worked hard in and outside our therapy sessions in the development of healthy patterns. He has also been involved in therapy services for himself at the National Institute for the Study, Prevention, and Treatment of Sexual Trauma in Baltimore, MD under the care of therapist Richard Feldman.

It is my belief that John has learned what he needs to learn from his mistakes, and the least restrictive sentence is recommended. He has many abilities and has been a significant support to his wife, children, and ailing parents, traveling every three weeks to Connecticut to facilitate his dad's chemotherapy treatments. John recently retired from his employer of 19 years and has invested his time in caring for his family. While an incarceration would be very difficult, it is clear that John would be able to serve his sentence confident of the love and support of his family.

It is my plan to continue work with this couple as they transition through the weeks ahead and prepare for the July court date, providing services as needed following the court date. While the wait for sentencing has been quite long, it has been a gift of time. John and Debra have truly made use of that time. Each of them has found significant healing for themselves personally, and their marriage is much stronger, a place of comfort and solace as they face life's challenges.

If I can be of any further service in your work with John, please don't hesitate to contact me at 703/591-2551, ext. 29.

Sincerely,

*Theresa M. Shaltanis, MA, LPC, LMFT*

Theresa M. Shaltanis, M.A., LPC, LMFT
VA Licensed Professional Counselor
VA Licensed Marriage & Family Therapist

cc:  John E. DiFazio, Jr. and Debra Bell
     Richard Feldman

# UNITED STATES POSTAL INSPECTION SERVICE
# WARNING AND WAIVER OF RIGHTS

Place: 900 - 17TH St. NW #300

Washington DC. 20006

Date: 3-23-05    Time: 11:43 Am

## WARNING

**BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.**

- You have a right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
- If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

I have read this statement of my rights (This statement of my rights has been read to me) and I understand what my rights are.

| 3-23-05 | 11:45 Am | John E. DiFazio Jr |
|---|---|---|
| (Date) | (Time) | (Signature) |

## WAIVER

I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

| 3-23-05 | 11:46 Am | John E. DiFazio Jr |
|---|---|---|
| (Date) | (Time) | (Signature) |

Witnessed by: _____

Title: _____

Witnessed by: Ronald A. Palm

Title: Postal Inspector

PS Form 1067
Feb. 1980

## UNITED STATES
## POSTAL INSPECTION SERVICE

### STATEMEMT
### &
### ADVICE OF RIGHTS

CITY OF: _Washington_                    DATE: _3-23-2005_

DISTRICT OF: _Columbia_              TIME: _12:05 pm_

I, _John E. DiFazio Jr._, being duly sworn, depose and state the following:

I have been advised by United States Postal Inspector _Bob Northrop &_
of my rights under the Constitution as follows: _Ronell Parker_

1. I have the right to remain silent;

2. Anything I say or any statement I make can be used against me in court or other proceedings;

3. I have the right to talk to a lawyer for advice before being questioned and to have him/her with me during questioning;

4. If I cannot afford a lawyer, a lawyer will be appointed for me;

5. If I decide t answer questions now, or make a written statement, without a lawyer present, I still have the right to stop answering at any time.

I have read the above paragraph outlining my rights and it has been read to me. I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer present at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. This statement is voluntary on my part and is made to the true facts might be known. I do not expect to gain any reward or special consideration for making this statement.

_My name is John E. DiFazio Jr. and I am 54 years old born on Sept. 3, 1950. I wish to make the following statement:_

_I work at Consumer Specialty Products Association (CSPA)._     _John E. DiFazio Jr_     _R.A. Pahr_

②

I am an assistant general counsel at Rich CSPA. My email address at CSPA is jdifazio@cspa.org. This is the email address that I used to correspond with an individual named "Sam" I can only remember that his email address is "sacpuntas" at I don't know where.

I found "Sam" while reading an email posting sent to me and all other group members on one of the Yahoo groups I belong to. I belong to several Yahoo groups and receive dozens of emails per day.

I belong to several Yahoo groups, some of which are sexual. From these groups I have received emails offering everything from credit cards to child pornography.

John E. DiFazio Jr.

(3)

It was through one of these emails
that I corresponded with "Sam." I exchanged
emails with him for about one month. During
this correspondance I received on offer to
purchase DVDs containing various sexual
activity containing children.

I made one selection for which I paid $15
I expected the DVD to contain images
of a family with a father, 2 daughters
and a son (approximately 8, 9 and 12) all
engaged with each other in explicit sexual
activity. I sent the money to a P.O. Box
in the State of Maine. Today as expected
I received an Express Mail letter containing
what I presume is the above described
DVD. _____

④

All of my correspondence with "Sam" 2d
is on my Eudora email on my work computer
at CSPA. I have also informed Inspectors
Northrop and Parker where I have stored child
pornography images in my office.
I understand fully now from talking with
the Inspectors that in order for child porno-
graphy to be produced a child must be
sexually abused. As a father of 2 kids I
am ashamed and embarrassed that I would
even think about doing this. Just a few hours
ago it was a new sexual thrill but now it
is revolting and disturbing. I will never
engage in such activity again as God is
my witness.

                    John E. D. Fazio Jr. / R.R. Klug  Paul A. P.

Inspectors Northrop and Parker have shown me printouts of numerous email correspondance with "Sam." I have initialed and dated each of them indicating that they were written by me (my portion).

John E. DiFazio Jr.

To: The Honorable Richard J. Leon
United States District Court for the District of Columbia,
333 Constitution Avenue, N.W., Washington, D.C. 20001

From: Debra H. Bell, wife of John E. DiFazio, Jr.
8103 Oak Crest Lane
Fairfax Station, VA 22039

I am writing this letter in support of my husband, John, whom I believe to be a loving husband, father and son. Please give consideration to his family when applying his sentence. I respectfully request John receive a sentence that would not involve further punishment to his family. Please, may he serve a sentence that would keep him in close contact with his family. We need him at home. John provides not only material but emotional support for the entire family.

I have known and loved John for almost 30 years. I thought we had a good marriage before this happened but obviously John was in dire need of help and our marriage needed much improvement. Our lives have changed drastically as a result of his past actions--viewing pornography and most recently images that contained children-- but with our response I believe this life change has been for the good. John's problem is now in the open and not a secret from me. He no longer is alone in facing his troubles and I can now help him and will do all in my power to see that he receives the necessary support to continue his great progress in overcoming this problem.

John is a much different man now and our marriage is in a far better place. John has developed more successful and acceptable ways of dealing with stress. He shares his problems with me, his therapy group and our marriage counselor. He actively seeks helps when needed. We now turn to each other and discuss our problems. Our counselor also provides us much needed nudging to keep the lines of communication open between us and not backtrack into old habits of letting problems go unaddressed.

John proves himself to be a great father and provider on a daily basis. We are the proud parents of two adopted children from Poland. John knows the children's daily schedule and helps with their homework. He actively participates in their lives, attending their sports events and drama productions. Our son, Stefan, who will be attending UVA in the fall, benefits from his guidance daily. John has been the major advisor on colleges and has done most of the administrative paperwork needed to get our son into college. Our daughter, Alina, who was a special needs adoption from Poland also benefits daily from having an active, loving father. He guides her with her sports activities, driving her to most all of her soccer games. I firmly believe he has never posed a threat to either child's safety in any way. Now that he has retired, he provides the daily support both children need with travel to school, visits to the doctor, and all the daily chores to keep them well fed and clothed.

Unfortunately we have been adversely affected although innocent ourselves of his crime and would like to avoid further hardships if possible. Our life has already been

drastically changed as a result of these events. When we first learned of John's legal troubles, I was fearful that he would lose his job immediately. This posed a tremendous fear because he was the major provider for the family. Not only did he provide the necessary income for our daily needs but our health insurance also came from John's work. Therefore, my life changed from working part time to full time to meet these needs in case he lost his job. I had to return to work full time to provide the necessary income for John's legal expenses and medical coverage for our family. Although I do not regret my decision to stand by John during his troubled time, I respectfully request that the family not be made to suffer further by the loss of their father.

Please consider when sentencing John that in his crime, he was a voyeur. He poses no danger to others; therefore society will not be at risk if he receives probation and/or is allowed to stay in the home. John works hard to be a good father and husband and any sentencing that takes him away from his family would only make those around him suffer. I fully believe John is not a threat to others. I would not be standing beside him if I thought he posed any danger to those around him. While I am very hurt by what John did, I do have an understanding now of the patterns he developed in coping with stress that caused him to act as he did, and with the gift of time and some much needed counseling, I have come to forgive him. I think he will need continued therapy to insure this act is never repeated. He realizes the need to address his problems openly and has been working diligently since March 2005 to do exactly that. John attends regular sessions of group therapy and as a couple we engage in marriage counseling, both on a biweekly schedule.

Please also consider John's ailing parents' needs when sentencing. They too are very dependent on John both emotionally and materially. John is an only child whose father is dying of cancer. He has been traveling about every three weeks to Connecticut to help his ailing father. As his father's health has downwardly spiraled, these trips are getting more frequent. He helps his mother tremendously with the necessary support she has needed to get his father treatment. John's advice and counsel, as well as his management of her finances, has helped her greatly during this difficult time. It is our belief that with his father's death, his mother will eventually come to live with us. We will once again need more than an absentee husband/father/son to fulfill this role and help our family through these troubled times.

Therefore I respectfully request you consider in your sentencing not only John's efforts to set this part of his life straight but also the impact on his family. We need John's help in functioning as a family. For him to receive a sentence that takes him away from home only punishes us further and does nothing to help society.